UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAASHAD CARTER, | No. 08 CV 2381 JCW |
| Plaintiff, | <u>ORDER</u> |
| vs. | |
| L. CANNEDY, et al., | |
| Defendants. | |

Carter, a state prisoner proceeding pro se, has filed a civil rights action pursuant to 42 U.S.C. § 1983. On March 29, 2010, counsel for all eight defendants filed a motion to dismiss Carter's amended complaint under Federal Rule of Civil Procedure 12(b)(6). Carter has filed an opposition to the motion and the defendants have filed a reply. The motion to dismiss is GRANTED with leave to amend.

**I.**

"A complaint may survive a motion to dismiss if, taking all well-pleaded factual allegations as true, it contains 'enough facts to state a claim to relief that is plausible on its face.'" *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1034 (9th Cir. 2010) (citing *Ashcroft v.*

1

*Iqbal*, – U.S. –, 129 S. Ct. 1937, 1949 (2009)).  The following facts are alleged in Carter's amended complaint.

On November 21, 2007, Carter was placed into administrative segregation because prison officials suspected him of a battery on a fellow inmate.  Doc. 28 at 2.  On December 15, 2007, defendant Rivas, an officer at Folsom State Prison (Folsom), issued Carter a disciplinary report and on January 9, 2008, defendant Cannedy, another Folsom officer, conducted a disciplinary hearing in connection with the suspected battery.  *Id.*  Carter asked that the hearing be suspended because Rivas had failed to provide Carter with all non-confidential material that was to be used against him at the hearing.  *Id.*  Cannedy refused to suspend the hearing.  *Id.*  At the close of the hearing, Cannedy determined that Carter was guilty of the battery.  *Id.*  Carter alleges that, in finding him guilty, Cannedy relied on unreliable confidential information.  *Id.* at 2-3.

On January 25, 2008, defendants Lieber and Mandeville, officers at Folsom, reviewed the final adjudication report from the hearing and submitted it to the "classification committee," despite Carter's concerns regarding the information used at the hearing.  *Id.* at 3.  Carter alleges that as a result of the adjudication, Carter was transferred to Corcoran State Prison (Corcoran) and given a term of 24 months in the Segregated Housing Unit (SHU).  *Id.*

On February 6, 2008, Carter alleges that he appeared before the "institution committee," where he again complained about the procedures used at his disciplinary hearing.  *Id.* at 3-4.  Carter states that defendant Reyes, the chair of the committee and a Folsom officer, told him that the committee believed Cannedy conducted a fair hearing, and upheld the results of the hearing.  *Id.* at 4.  That same day, Carter filed an inmate grievance challenging the guilty finding.  *Id.*

1      Carter states that his grievance was *granted* on March 27, 2008, and the guilty disposition

2 was vacated and a new hearing ordered.  *Id.*  Carter alleges, however, that even after the guilty

3 disposition was vacated, he remained in administrative segregation or in the SHU at Corcoran for

4 some period of time.  *Id.*  On May 22, 2008, he requested that defendant Davis, the chief

5 discipline officer at Corcoran, conduct the new hearing, but received no answer.  *Id.*  On June 5,

6 2008, he filed another grievance, this time regarding Corcoran's failure to conduct his new

7 hearing, but he alleges that defendant Cano, another Corcoran officer, rejected ("screened out")

8 his grievance on the ground that it was not Corcoran's responsibility to conduct a new hearing

9 regarding events that had occurred at a different facility.  *Id.* at 4-5.  Carter states that he then

10 "returned the screenout form," arguing that it was Corcoran's responsibility to hold a new

11 hearing, but that on June 19, defendant Nicholls, a correctional counselor at Corcoran, reviewed

12 the grievance and again rejected it; Carter alleges it was "screened without relief and an

13 unintelligible response was given do [sic] to C. Nicholls['s] handwriting."  *Id.* at 5.  On June 22,

14 2008, Carter again wrote to Davis, seeking his rehearing.  *Id.*  On June 24, he appealed to the

15 next level in the inmate appeal process, but this appeal was rejected on July 3 by Cano because

16 Carter had forgotten to sign a form.  *Id.* at 5-6.

17     On July 25, 2008, Carter received a new discipline report; on August 22, he received his

18 new hearing.  *Id.* at 6.  He alleges that at the new hearing, he was found not guilty of the battery

19 "due to the non-reliability of the confidential information."  *Id.*  Carter's opposition to the motion

20 to dismiss says that his new hearing "was conducted four months after the [original] guilty

21 finding was vacated subjecting plaintiff to the abnormal living conditions of the SHU."  This

22 allegation is unclear.  It may be that he is attempting to allege that he remained in the SHU until

23

3

sometime after his second hearing, a time period of just under five months. Doc. 40 at 6. It is not clear when Carter was moved from the SHU following his second hearing, but his amended complaint alleges that he spent at least 285 days "in administrative segragation [sic] and the SHU." Doc. 28 at 4. At some point, he was apparently removed from the Corcoran SHU, because as of August 2, 2009, the date of his amended complaint, he was no longer at Corcoran. Doc. 28 at Cover Sheet (listing address as Salinas Valley State Prison); *see also* Doc. 28 at 1 (identifying himself as a prisoner at Tehachapi State Prison).

## II.

Based on the above alleged facts, Carter argues that he is entitled to relief under 42 U.S.C. § 1983 on grounds that he was deprived of due process of law as guaranteed by the Fourteenth Amendment (1) when at his initial hearing, Rivas failed to give him all the non-confidential information to be used against him, and Cannedy nonetheless refused to suspend the hearing; (2) when at the hearing, Cannedy found him guilty based on confidential information without an appropriate assessment of the reliability of that information; (3) when defendants Lieber, Mandeville and Reyes ratified the allegedly faulty results of the hearing; (4) when Davis failed to respond to his request for a rehearing; (5) when Cano failed to file Carter's grievance; and (6) when Nicholls failed to grant his appeal.

Carter also asserts that his right under the Fifth Amendment was violated when Reyes affirmed the results of the hearing. He further alleges that Cano impeded his First Amendment right of access to the courts and right to petition the government for the redress of grievances, as well as his due process rights, when he failed to file Carter's grievance, and that Nicholls violated his First Amendment right by failing to grant Carter's grievance.

4

## III.

Carter fails to state a claim for relief under section 1983 based on violations of the First Amendment. Carter asserts that Cano and Nicholls violated his First Amendment right of access to court and right to petition the government for the redress of grievances. In his opposition to the motion to dismiss, he elaborates on this argument, contending that Cano "initially tryed [sic] to interfere with plaintiff filing his appeal by stating his institution was not the proper venue for filing the appeal, because the violations occurred at another facility," but that after further communication from Carter, Cano "processed the appeal" and "passed [the appeal] along to Defendant Nicholls who failed to properly grant the relief." Carter also takes issue with Cano's dismissal of one of his appeals for failure to sign a form.

These facts, even if true, do not give rise to a First Amendment violation. Prisoners do have a First Amendment right to file prison grievances, *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009), and a prisoner's "right of meaningful access to the courts extends to established prison grievance procedures." *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995). But a prisoner's right to petition the government is a right of expression and "does not guarantee a response to the petition or the right to compel government officials to act on" the petition. *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999). Carter acknowledges that his grievance was eventually filed, and indeed, that he received the hearing he sought. Carter may feel that the officers erred in their *handling of* his grievance once it was filed, such as Cano's initial denial on the belief that Corcoran was not responsible for conducting a hearing regarding events at another prison, Nicholls's subsequent denial for unclear reasons, Cano's later denial due to Carter's failure to sign a form, and the overall delay between June 5, 2008, when he filed his grievance,

and August 22, 2008, when he received the requested relief of a new hearing. But allegations regarding improper handling of a grievance or improper rejection of a grievance on its merits do not show he was actually prevented from exercising his First Amendment right to *file* prison grievances, and he has not alleged that he suffered a penalty or retaliation for filing a grievance so as to establish a "chilling effect" on his right to file such grievances. *Compare Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (holding that a prisoner made out a First Amendment claim by alleging that prison officers confiscated property, threatened him with transfer, and assaulted him in retaliation for his exercise of his right to file prison grievances, thereby chilling his exercise of his First Amendment rights without any legitimate penological purpose). Therefore, Carter has failed to state a valid First Amendment claim, and defendants' motion to dismiss is granted as to those claims.

## IV.

Carter has also failed to state a cognizable section 1983 claim based on alleged violations of the Due Process clauses of the Fifth[1] and/or Fourteenth Amendments. "It is well-established that the requirements of procedural due process apply only to the deprivation of interests

---

[1] Carter claims that his rights under the Fifth Amendment were violated when Reyes affirmed the results of the hearing, stating conclusorily that "the actions of Defendant M. Reyes for saying 'we believe Lieutenant Cannedy conducted a fair hearing and therefore your [sic] guilty' is in violation of the fifth amendment to the U.S. constitution." The remainder of his due process claims cite the Fourteenth Amendment only. Defendants correctly point out in their motion to dismiss that Carter's amended complaint makes no attempt to explain how Reyes's review of a prison disciplinary hearing could violate the Fifth Amendment, and his response to the motion to dismiss offers no explanation either, instead focusing only on the First and Fourteenth Amendment claims. Therefore, I will treat Carter's Fifth Amendment claim as invoking the same due process argument as his other due process claims regarding the Fourteenth Amendment, and his Fifth Amendment claim is properly dismissed for the reasons stated in Part IV of this Order.

encompassed by the Fourteenth Amendment's protection of liberty and property." *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003) (internal quotation marks, citations and alternations omitted).

> The Due Process clause provides prisoners two separate sources of protection against unconstitutional state disciplinary actions. First, a prisoner may challenge a disciplinary action which deprives or restrains a state-created liberty interest in some "unexpected manner." . . . Second, a prisoner may challenge a state action which does not restrain a protected liberty interest, but which nonetheless imposes some "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

*Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003), *citing Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).

A prisoner's "claimed loss of a liberty interest in the processing of his appeals does not satisfy [the first] standard, because inmates lack a separate constitutional entitlement to a specific prison grievance procedure." *Id.* The mere fact that a state has created a prison administrative appeal or grievance system does not implicate a liberty interest triggering due process protections. *See Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996). Even violations of state prison departmental regulations, without more, do not state federal claims and are not cognizable under section 1983. *Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009). Similarly, "a prisoner does not have a constitutional right to be free from wrongfully issued disciplinary reports." *Buckley v. Gomez*, 36 F. Supp. 2d 1216, 1222 (S.D. Cal. 1997), *aff'd on other grounds*, 168 F.3d 498 (9th Cir. 1999) (unpublished). Thus, Carter cannot state a claim by simply alleging improper handling of his

grievances or appeals, and it is insufficient for him to allege that he was wrongly found guilty of the assault.

Looking, then, to the second type of due process protection given to prisoners against unconstitutional state disciplinary actions, the Supreme Court ruled in *Sandin v. Conner*, 515 U.S. 472, 484 (1995), that "a prisoner possesses a liberty interest under the federal constitution when a change occurs in confinement that imposes an atypical and significant hardship in relation to the ordinary incidents of prison life." *Jackson*, 353 F.3d at 755 (internal quotation marks, citations and alternations omitted). To survive this motion to dismiss, Carter must allege facts that, if true, would permit a conclusion that his confinement in the SHU as a result of the defendants' actions gave rise to an atypical and significant hardship in relation to the ordinary incidents of prison life. *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000). If so, then he was entitled to the procedural protections set forth in *Wolff v. McDonnell*, 418 U.S. 539 (1974). In *Wolff*, the Supreme Court explained that, while prison disciplinary proceedings are not part of a criminal prosecution and thus do not trigger "the full panoply of rights due a [criminal] defendant," safeguards for such proceedings must include written notice of the charges at least 24 hours before the hearing, the opportunity to call witnesses and present documentary evidence where doing so would not be unduly hazardous to prison security and goals, an opportunity to seek staff or inmate assistance if the inmate is illiterate or the issues are complex, and a written statement of the evidence relied upon and the reason for the actions taken. *Id.* at 556, 563-70. Moreover, due process requires that "there must be some indicia of reliability of the information that forms the basis for prison disciplinary actions." *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987).

1    Defendants argue that Carter's due process claims must be dismissed because his
2 placement in the SHU "on a temporary basis, whether for punitive or administrative purposes,
3 does not impose an atypical or significant hardship, and therefore, does not necessitate due
4 process protections." Doc. 32 at 5.  In support, they cite *Sandin*, in which it was held that a
5 prisoner who was placed in disciplinary segregation in a prison's SHU for 30 days had no
6 cognizable procedural due process claim because he had no liberty interest in being free from
7 such confinement.  515 U.S. at 487.  The Ninth Circuit Court of Appeals has held that "[t]here is
8 no single standard for determining whether a prison hardship is atypical and significant," and that
9 question generally requires "case by case, fact by fact consideration" of the conditions or
10 combination of conditions or factors at issue.  *Ramirez*, 334 F.3d at 861 (internal quotation marks
11 and citation omitted).  However, that court has identified "guideposts" that "provide a helpful
12 framework: 1) whether the challenged condition mirrored those conditions imposed upon
13 inmates in administrative segregation and protective custody, and thus comported with the
14 prison's discretionary authority; 2) the duration of the condition, and the degree of restraint
15 imposed; and 3) whether the state's action will invariably affect the duration of the prisoner's
16 sentence."  *Id*. (internal quotation marks and citation omitted).
17    Here, Carter has not alleged facts that would permit a conclusion that his term in the SHU
18 imposed a significant and atypical hardship.  The amended complaint contains essentially no
19 information about how the conditions at the SHU differed from those imposed on inmates in
20 administrative segregation and protective custody, and it does not allege how the SHU conditions
21 are different from those imposed on the general population.  The Ninth Circuit Court of Appeals
22 has affirmed the dismissal of due process claims where a plaintiff spent 70 days in an SHU while
23

awaiting a disciplinary hearing, but there was "no allegation that Plaintiff's segregation in the SHU was materially different from those conditions imposed on inmates in purely discretionary segregation," no allegation "that the conditions at the SHU, compared with conditions in the general population, created a 'major disruption' in Plaintiff's environment," and no allegation that the length of the plaintiff's overall sentence was affected. *See Resnick*, 213 F.3d at 448.

Carter does mention in his opposition to the motion to dismiss that his transfer to the SHU caused him to be removed from a setting in which he could regularly visit with family, resulted in the destruction or confiscation of some of his belongings, and caused him "grievous loss." Doc. 40 at 4. He also characterized the SHU as "abnormal living conditions." *Id.* at 6. However, these allegations appear nowhere in the amended complaint. "The 'new' allegations contained in [an] opposition motion . . . are irrelevant for Rule 12(b)(6) purposes," and I may not look beyond the complaint in deciding a motion to dismiss for failure to state a claim. *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998). Moreover, even if they were included in the amended complaint, they are largely conclusory and would be insufficient to show that the SHU imposed a significant and atypical hardship on Carter as compared with conditions in administrative segregation or the general population. *See Resnick*, 213 F.3d at 445 n.3 (holding that it was insufficient to allege that, "in the SHU, recreational opportunities and access to showers are limited; the mattress is flat and dirty; no pillow is allowed; a prisoner cannot have access to the library; and half the time the food is cold," where there was no allegation about how those conditions were different from administrative segregation or the general population). In *Williams v. Foote*, the district court dismissed an inmate's complaint despite allegations that, as a result of his placement in segregation, the plaintiff had lost personal

10

1  items and legal materials; that he was denied access to the law library; that he was denied

2  adequate food as a form of punishment and called a "snitch" in front of other inmates; that he had

3  reduced access to privileges such as phone calls, packages, television, radio, visitation, exercise,

4  work, and education and trade courses. 2009 WL 1520029 (C.D. Cal.). The district court

5  observed that the plaintiff there had "attempted to allege differences between conditions in

6  segregation and conditions in the general population," but did not allege "the extent to which the

7  conditions of his confinement in [administrative segregation] or the SHU worked a major

8  disruption in his environment as compared to the general population . . . or were different than

9  those imposed upon inmates in non-punitive administrative or discretionary segregation." *Id.* at

10  \*10 (internal quotation marks and alterations omitted). The district court also stated there was no

11  allegation that the defendant's actions affected the duration of his overall sentence (for example,

12  through loss of good time credits). *Id.*

13  Carter's amended complaint does not attempt to make the comparisons contemplated in

14  *Resnick* and *Williams*, and he does not allege that the events of which he complains affected the

15  duration of his overall sentence. Indeed, the amended complaint does not even clearly state how

16  long he was in the SHU. He alleges that he was placed in *administrative segregation* while

17  awaiting his hearing (*i.e.*, from November 21, 2007 until January 9, 2008), and then alleges that

18  he was "in administrative segragation [sic] and the SHU 285 days as of this petition." Amended

19  Complaint at 2-4. But it is unclear at what point he was moved from administrative segregation

20  to the SHU, and at what point he was released from the SHU after his new hearing was held. I

21  do not even have enough information to evaluate how long he was in the SHU, which is one of

22  the guideposts that would be helpful in evaluating whether Carter was subject to a significant

23

11

hardship. *Ramirez*, 334 F.3d at 861. Moreover, *Williams* observed that even a term of 701 days of segregation did not alone give rise to a liberty interest. 2009 WL 1520029 at *10.

It is possible that Carter might be able to allege additional facts that would permit him to state a valid due process claim. In *Jackson*, an inmate was moved to administrative segregation pending a disciplinary hearing regarding an alleged battery on a prison doctor. 353 F.3d at 753. After a hearing at which he was not allowed to call witnesses, he was found guilty and sentenced to one year in Corcoran's SHU. *Id.* He appealed, and his appeal was eventually granted, his transfer to the SHU was vacated, and a new hearing was ordered. *Id.* However, he was then transferred to the SHU anyway, despite his protests and attempts to have the transfer cancelled. *Id.* at 753-54. Jackson spent five months at the SHU before being transferred back to administrative segregation; he never did receive a new hearing because the rule violation report was later dismissed. *Id.* at 754. Jackson's section 1983 complaint alleged that, while in the SHU, he lost legal materials and some of his personal items were confiscated or damaged; he also alleged that as a result of his placement in SHU, he suffered instability, was denied medical treatment, suffered discrimination and harassment, and was unable to visit with friends and family. *Id.* His complaint outlined the conditions in the general population, administrative segregation, and in the SHU, and how they differed from one another. *Id.* at 755-56. The Ninth Circuit Court of Appeals held that the complaint stated a claim. *Id.* at 755-57. The court observed that Jackson had "cover[ed] his bases" by comparing the SHU to both the general population and to administrative segregation, and distinguished *Resnick* on the ground that the plaintiff in *Resnick* had not alleged that the SHU imposed conditions materially different from those in discretionary administrative segregation, nor that the conditions in the SHU created a

major disruption in his environment. *Id.* at 756-57; *see also Ramirez*, 334 F.3d at 861 (remanding case for application of the *Sandin* factors, where plaintiff alleged that he had spent two years in a segregation unit that was overcrowded and violent, that the isolation severed ties to his family, and that while in the segregated unit, he had been subjected to psychiatric treatment).

If Carter can amend his complaint to allege facts that would support a conclusion that his term in the SHU imposed an atypical and significant hardship, he also needs to allege that he did not receive the required due process under *Wolff* and *Cato*. He alleges that he was found guilty of assault at his initial hearing based on "confidential evidence . . . without a reliability test." He states that the confidential information in question "proved to be unreliable in (3) three earlier, disciplinary hearings in which the same information was used," and alleges that, after his second hearing, he was found not guilty "due to the non-reliability of the confidential information." Construing the complaint liberally and drawing all reasonable inferences therefrom, Carter has adequately alleged that his initial placement in the SHU was not supported by "some evidence" possessing "some indicia of reliability" as required by *Cato*. 824 F.2d at 705; *see also Williams*, 2009 WL 1520029 at *11-13 (concluding that, although plaintiff had not alleged facts to support a conclusion that his placement in the SHU triggered due process protections, he did sufficiently allege that his initial disciplinary hearing and conviction lacked procedural due process protections insofar as they resulted from reliance on false confidential information, where the plaintiff was later granted a new hearing based on witness inconsistencies, and where his second hearing resulted in dismissal of the charges as based predominantly on unsubstantiated confidential information that did not meet criteria for reliability).

In sum, although Carter has sufficiently alleged procedural defects in connection with his first hearing, his amended complaint is insufficient to support a conclusion that his term in the SHU created a significant and atypical hardship that triggers due process protections. However, I must construe pro se pleadings liberally and afford pro se litigants the benefit of any doubt. As I am unable to determine whether amendment to this pleading would be futile, Carter will be given leave to amend his complaint to try to state a valid due process claim based on his time in the SHU.[2]

## V.

In accordance with the above, IT IS HEREBY ORDERED that:

1. Defendants' motion to dismiss is GRANTED as to Carter's claims for relief under section 1983 on the basis of alleged violations of the First, Fifth and Fourteenth Amendments. Plaintiff's amended complaint, filed October 21, 2009 (Doc. 28) (hereinafter First Amended Complaint), is DISMISSED, pursuant to 28 U.S.C. §§ 1915A and 1915(e)(2), for failure to state a claim on which relief may be granted:

2. Within twenty-eight (28) days from the date of this order, plaintiff may submit a Second Amended Complaint to cure the deficiencies discussed above. The Clerk of Court will mail plaintiff a court-approved form to use for filing the Second Amended Complaint. If plaintiff fails to use the court-approved form, the court may strike the Second Amended Complaint and dismiss this action without further notice.

---

[2] Because I conclude that Carter has not sufficiently alleged that his term in the SHU triggered due process protections, I need not address the defendants' alternative argument regarding qualified immunity at this time.

In any amended complaint, plaintiff must write short, plain statements explaining: (1) the constitutional right plaintiff believes was violated; (2) the name of each individual defendant who violated that right; (3) exactly what that defendant did or failed to do; (4) how the action or inaction of that defendant is connected to the violation of plaintiff's constitutional right; and (5) what specific injury plaintiff suffered because of that defendant's conduct. *Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976). Plaintiff must repeat this process for each person he names as a defendant. If plaintiff fails to link affirmatively the conduct of each named defendant with the specific injury suffered by plaintiff, the allegation against that defendant will be dismissed for failure to state a claim. Conclusory allegations that a defendant or group of defendants have violated a constitutional right are not acceptable and will be dismissed.

Plaintiff must clearly designate on the face of the document that it is the "Second Amended Complaint," and it must be retyped or rewritten in its entirety on the court-approved form and may not incorporate any part of the original or First Amended Complaints by reference. The Second Amended Complaint must be "complete in itself without reference to the prior or superseded pleading." Local Rule 15-220.

Any amended complaint supercedes the original complaint. *Ferdik v. Bonzelet*, 963 F.2d 1258 (9th Cir. 1992). After amendment, I will treat the original and First Amended Complaints as nonexistent. *Id.* at 1262. Any cause of action that was raised in the original or First Amended Complaints is waived if it is not raised again in the Second Amended Complaint. *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987). Plaintiff is NOTIFIED that the Second Amended Complaint may not add new claims or new defendants that were not involved in the conduct, transactions, or occurrences set forth in the Original and First Amended Complaints. Fed. R. Civ. P. 15(c).

**28 U.S.C. § 1915(g)**

Plaintiff is further NOTIFIED that the First Amended Complaint has been dismissed for failure to state a claim.  If plaintiff fails to file an amended complaint correcting the deficiencies identified in this Order, this dismissal will count as a "strike" under 28 U.S.C. § 1915(g).  28 U.S.C. § 1915(g) states: "In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury."

3. If plaintiff fails to file a Second Amended Complaint within twenty-eight (28) days from the date of this order, the Clerk of Court is DIRECTED to enter judgment of dismissal of this action with prejudice, clearly stating that the dismissal counts as a "strike" under 28 U.S.C. § 1915(g).

4. The Clerk of Court is DIRECTED to send plaintiff a prisoner civil rights complaint form so that he may amend the First Amended Complaint.

5. At all times during the pendency of this action, plaintiff SHALL IMMEDIATELY ADVISE the court and opposing counsel of any change of address and its effective date.  Such notice shall be captioned "NOTICE OF CHANGE OF ADDRESS."  The notice shall contain only information pertaining to the change of address and its effective date, except that if plaintiff has been released from custody, the notice should so indicate.  The notice shall not include any motions for any other relief.  Failure to file a NOTICE OF CHANGE OF ADDRESS may result

in the dismissal of the action for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b).

DATED: August 9, 2010
/s/ J. Clifford Wallace
J. Clifford Wallace
United States Circuit Judge